Steve Geers here. Mr. Brown, you will educate us. Thank you, Your Honor. May it please the Court, Government Counsel Lawrence Brown on behalf of the appellants. The first issue I'd like to address is the bad debt issue. What we're talking about here is a loan of $430,500 made by Mary Hatcher in multiple tranches during 2004 and the syndication of a comic strip named In the Rough, which essentially used golf as a metaphor for life. In her trial testimony, the appellants were pro se before the tax court. In her trial testimony, Ms. Hatcher compared what she planned to do with In the Rough to what Gary Larson had done with The Far Side, which was a comic strip fully syndicated from 1980 to 1995, ultimately carried in about 1,900 daily newspapers, translated into 17 languages, etc., etc. So I highlight that to show that this wasn't just a boondoggle or a hobby-ish thing. There was some real economic potential here. At the time Ms. Hatcher began to loan the money, we were well beyond the conceptual phase. Mr. Carpenter had prepared a business plan. He'd done some preliminary illustrations and presented those to the Dallas Morning News, I believe. Ms. Hatcher, I would assume that this was right in her wheelhouse. She'd been an executive at Blockbuster. A lot of her experience was on the finance side with Blockbuster. Nonetheless, she had significant experience monetizing, developing, syndicating content, and that's what this business opportunity was all about. Much in this case, much has been made, both in the government's brief, the tax court's writing, etc., that Mr. Carpenter and Ms. Hatcher were romantically involved during the relevant period, 2004 and 2005. I think the tax court concluded that no other borrower would have gotten the terms that Mr. Carpenter got. No credit check, no collateral. Those facts are what they are. I would submit that Ms. Hatcher's economic upside, if you will, was based on profits from syndication. That's how she was going to get repaid. That's how she was going to profit on this deal. Okay, but isn't all of this factual? You just said these are facts, these are facts, and there's a lot of facts here. I'm not saying somebody couldn't have ruled for your client, but it seems to me on review that you have to show there's no way they could have ruled against her. How can you show that? Your Honor, the standard of review is clear error. Indeed, your point is very, very well taken. My position, the appellant's position, is that the list of facts that would support this as a business loan are just incontrovertible. But there's some evidence that it was, you know, it's your buddy, it's the guy you're in love with, whatever, and so that's some evidence to support that it wasn't a business loan. Then there's some evidence that it was the comic strip and the business plan and all of that. But even putting that aside, the issue of whether it became uncollectible in 2010, there's a lot of facts around that, including that she sued him after that, and the very things that you're pointing to about his creativity and his ability to do a comic strip suggest to me that he could someday pay that judgment. I mean, that's why you get a judgment against someone you think right now is a deadbeat debtor, but may come into money. When I was a very young lawyer, I got a lot of those judgments, and some of them eventually paid, because eventually they did come into money. So aren't those both very fact-bound, the business loan and the fact that it became worthless in 2010, or allegedly did? I agree, Your Honor. Those are both questions of fact, clear error of standard. With regard to the worthlessness, I mean, they started on this project in 2004. We're now December of 2010. It had never been syndicated. It hadn't been fully developed at that point. The only repayments had been very, very token amounts from Mr. Carpenter. The email from Mr. Carpenter to Ms. Hatcher roughly December of 2010, I think, said something like, I have no money, or I simply can't repay, something like that. I think what the case law says is that if there's a reasonable basis to believe that the loan is worthless, it's worthless for these purposes here. But then why would she sue him? Because that's expensive, even if you're just talking about the filing fee, etc. Why would you sue someone that you think just never will have money, and the debt is worthless? There's no point to that. In Ms. Hatcher's testimony, she said that she sued because the statute of limitations was coming up. I think basically many times we see a creditor simply wanting a judgment against an insolvent debtor in case he or she hits the lottery someday. So I think just to have that judgment. But this guy has more potential than that, by the point you made. Maybe not this specific comic strip, but he's shown some degree of creativity, some ability to put together a business plan, and so forth. There's all these stories about actors and so forth that then got discovered, and it took them years, and they were an overnight success after 20 years. So again, this is that kind of business where somebody can do that. And so why would we say the tax judge had to find it worthless? Not could have found it worthless, but had to. That's what you're really arguing. It had been by 2010. It had been six years. The project had failed by that point. Yeah, sure, maybe he hits the lottery. Maybe he hits it big with another creative project. But my goodness, how long do you wait? When does this deal become worthless? I would submit that in December of 2010, it was clearly worthless. I think it arguably becomes worthless after you get the judgment, and you can do post-judgment discovery at that point, which you can't do just willy-nilly. Now you have a judgment that allows you to go and question him under oath. You can go get all kinds of documents, and you can subpoena people. You can send a sheriff out to start selling his couch. And believe me, that money starts flowing when the sheriff shows up at the door to start attaching property, garnishing bank accounts, et cetera. That's why all those collection remedies are out there. You get the Texas turnover statute, which is extremely broad, and you can get all kinds of inchoate causes of action and whatever. So that seems to be a time at which you could then, because having mined all of that, you found nothing, even putting aside his ability to perhaps make money in the future. This is the other way around. She declared it worthless before she went through all that. Well, I'd submit that based on the working relationship, based on the personal relationship, which went back years prior, based on the repayment history, based on the e-mail, et cetera, et cetera, she had a reasonable basis to conclude at that point that it was worthless. And on the issue of worthlessness, that's all we're talking about. We're not talking about a mathematical certainty. It's simply a reasonableness. Was it reasonable to conclude that the loan was worthless? And I would submit that it was. I'd like to, while I've still got some time, I'd like to address the other two issues that I've prepared today, the real estate rental loss and the accuracy-related penalty. So on the real estate issue, basically the essence there is that if a taxpayer materially participates in real property business, during the year at issue, defined by more than one half of his personal services being done in real estate and him spending over 750 hours involved in real estate services, he gets to take the loss, he gets to take the deduction. And here, what the tax court did is, in some back-of-the-envelope math, Mr. Hatcher had a rental property right here in Dallas, and he spent 450 hours on work related to that rental property. There was testimony, however, that he had some other hours spent in real estate work, reviewing loans that he'd previously done and expected to refinance, preparing to refinance, advising clients, and we'd urge that the tax court never really made a finding with regard to those hours, and that there should be a remand for the court to delve into that and make a ruling on those hours. And the final issue, substantive issue, that I'd like to address is the accuracy-related penalty. Essentially, the accuracy penalty is attributable to the bad debt issue, and Ms. Hatcher's testimony was that she was diligent, that she reviewed IRS Publication 535, which I've got at the podium, and it's nearly 60 pages of fine print. I think there was plenty to support her position that this was a business loan, as we've touched on previously. In addition to the facts that we've talked about already today, multiple promissory notes that were haggled about and negotiated, that's consistent with a business loan and not a personal loan, all of the other facts that would show this to be a business loan. In light of those facts, in light of the fact that these are fairly sophisticated issues here, either... You say they're sophisticated, but you also said this was her wheelhouse. She's got a finance background. She's dealt in her blockbuster role with the IRS, and I understand it's voluminous and convoluted and all that, but should we hold her to a slightly higher standard when it comes to following the guidelines of 535, given her finance background, her business background, her acumen, her wheelhouse, as you put it? Yeah, I would say so, Your Honor, when it comes down to reasonable cause and good faith, someone with a master's in finance and all of her experience at the executive level and this kind of stuff at Blockbuster, I think so. But nonetheless, I don't think we should impose the penalty simply because she got it wrong, if indeed that's the court's finding, that she got it wrong. Our position is that, again, this was something that started with a business plan. There'd been some preliminary shopping of the concept of the Dallas Morning News. It was something that using the far side as a way to speak back and forth over requesting repayment. The fact, and I think this is a big fact, both on whether it was a business loan or not and the accuracy-related penalty, the fact that the loans continued even after the personal relationship ended. That was early in Ms. Hatcher's direct examination at trial. She was asked, why did you continue to loan money even after you stopped dating this guy, if you will? And she said, because we had to continue with the syndication efforts. Out of that money, lawyers were paid, illustrators were paid. So all of this, again, supporting our position that it was a business loan. But even if it isn't, there was plenty to support Ms. Hatcher's, the position that she took on the return. And for that reason, we'd urge that, yes, even though she's got a master's in finance and is sophisticated, despite those things, there was good faith in her doing what she did, taking the position she took on the return. And it looks like I've got a yellow light, so I'll step down unless there are other questions. Well, you've got two. They don't get added on to five, so once you leave, they're done. So you have five minutes for rebuttal, but you're still on the clock. If you're yielding, then I think we have your argument, unless you want to say more. I think that does it for now, Your Honor. I appreciate the court's indulgence. Thank you, sir. Mr. Greaves from the Department. Good morning. May it please the Court, my name is Travis Austin Greaves, and I represent the government in this case. We ask that this Court affirm the tax score on all three issues, because first, the debt at issue was neither a business bad debt nor was it worthless in 2010. Two, Mr. Hatcher failed to qualify as a real estate professional in the tax year 2010, and three, the Hatchers failed to establish reasonable cause in good faith in taking the aforementioned deduction. Now, Judge Haines, as you pointed out, we agree here that the proper standard of review is clear error, and appellants have failed to show that there's any clear error in the tax court's findings of fact. On the first issue, the carpenter debt, we need to decide whether or not it was a business bad debt and whether it was worthless. In both instances, the tax court found that it was not. The reason is that Ms. Hatcher was not in the business of lending money. Rather, she was an employee. In addition, she was not engaged in any trader business, neither her nor her business entity, MBH Partners, was engaged in any trader business that had an approximate relationship with the debt to Mr. Carpenter. And that's what's required in order to find that the debt was, in fact, a business bad debt. Now, even if the court does find that the debt at issue was a business bad debt, it was not worthless in 2010. For the debt to be deemed worthless, the debt must have lost all value, and there must be no hope in collecting on it. Now, Judge Haines, as you pointed out, they filed suit. Within the month that they took this deduction, which would have been the tax year 2010, they filed their tax return that February in 2011. That same month, they filed suit in state court, attempting to collect on that debt. So if there was no hope in collecting on that, why would they have filed suit here? Why would they have thrown good money after bad? And they wouldn't have. Judge Willow, as you pointed out, is a sophisticated taxpayer, MBA in corporate finance. She would have known not to have gone after, thrown good money after bad in this case. Do you know whether they pursued post-judgment discovery after getting the judgment? I do not, Your Honor. The next issue involves the real estate expense deduction. Here, the Hatchers deducted expenses tied to their Anita Street property here in Dallas, offsetting that from non-passive gains. To qualify for the claim deduction, a taxpayer must bring forth evidence that he performed more than 750 hours of real property services during the tax year. Now, based on the testimony and evidence presented at tax court, the judge found that Mr. Hatcher participated in the real estate business for at most 450 hours. Mr. Hatcher testified that he had spent between 10 to 15 hours per month for the first six months of 2010. Where did the 450 number come from? Was it only his testimony and no documentation? That's correct, Your Honor. That he spent 10 to 15 hours per month for the first six months on this property, and then the final six months spent 10 hours per month. There were no other testimony regarding any other type of hours spent on any other type of real estate activities. The final issue before the court is the accuracy-related penalty. And there's no dispute that if the bad debt deduction is disallowed, that there was a substantial understatement on the Hatcher's tax return. The Hatchers have claimed the defense of reasonable cause and good faith. Now, in asserting this defense, the taxpayer bears the burden of proving that they acted with reasonable cause and good faith. And as Appellant has said, they relied upon IRS Publication 535 as a reason for why they took the positions that they did. The problem with that is Publication 535 believes at odds with the positions they took. For example, Publication 535 states that a bad debt deduction, including the interest portion, is allowable only if the amount owed to you was previously included in gross income. Well, the Hatchers claimed a bad debt deduction of over $170,000 of accrued interest, yet that interest had never been included in gross income. In addition, Publication 535 states that a debt does not become worthless until there is no longer a chance that the amount owed will be repaid. Well, as I mentioned earlier, in the same month that they filed their tax return, that same month, they filed suit believing that the debt could, in fact, be repaid. So in reading Publication 535, they obviously would have known that they The court has no further questions. We ask that you affirm the tax report on all three issues as the Pelhamists fail to show that the tax report clearly erred. Thank you, sir. I'll share it. Back to you, Mr. Brown. I'll be brief. I'm not going to rehash any of the statements made previously, but I wanted to address Judge Haynes' question about post-judgment discovery, and I believe the record shows that there was fairly extensive post-judgment discovery, and all of that showed that Mr. Carpenter was insolvent. I don't think there was a single So then why wouldn't that be the year that it's worthless? Because there was reasonable basis in 2010, given the December email, to conclude then that it was worthless. I think certainly after the post-judgment discovery, certainly at that point we know by a mathematical certainty that this debt is worthless. I'd submit that in 2010, it's reasonable to conclude that the debt was worthless. That's all I have. I really appreciate the attention. Thank you. All right. Thank you, sir.